**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

John Killingsworth,          )    No. CV 03-1950 PHX NVW
                              )
         Plaintiff,       )    **ORDER**
                              )
vs.                      )
                              )
State Farm Mutual Automobile Insurance)
Company; Dave Gonzales,     )
                              )
        Defendants.     )
                              )

Before the court are Defendants' Motion for Summary Judgment on All Remaining Claims (doc. # 217) ("Motion"), Defendants' Statement of Facts in Support of Motion for Summary Judgment on All Remaining Claims (doc. # 218) ("DSOF"), Defendants' Appendix of Evidence #'s 1, 2, and 3 (doc. #s 218a, 218b, and 218c) (referenced together as "DSOF Ex."), Plaintiff's Opposition to Motion for Summary Judgment (doc. # 229) ("Response"), Plaintiff's Separate Statement of Material Facts (doc. # 230) ("PSOF"), Plaintiff's Appendix of Exhibits #s 1, 2, 3, and 4 (doc # 231 (Vol. 1-4)) (referenced together as "PSOF Ex."), Defendants' Reply in Support of Defendants' Motion for Summary Judgment (doc. #271) ("Reply"), and Defendants' Objections to Plaintiff's Separate Statement of Material Facts ("Objections")(doc. # 270).

Defendants State Farm Mutual Automobile Insurance Company and Dave Gonzales seek summary judgment against Plaintiff Killingsworth's remaining claims of (1) Age Discrimination in Employment Act discrimination and 42 U.S.C. § 1981 race discrimination

1   in his demotion and alleged constructive discharge and (2) breach of contract, promissory

2   estoppel, and the implied covenant of good faith and fair dealing in deferring consideration

3   of, rather than immediately granting, his request for a State Farm agency when he wanted to

4   leave State Farm's employ.

5   **I.     FACTUAL SUMMARY AND PROCEDURAL HISTORY**

6          Killingsworth began working with State Farm as a trainee agent in 1978.  In 1980 he

7   became an employee of State Farm as an agency manager.  He claims that when he was

8   recruited into management he was promised that he could return to agency status at his

9   request.  In 1995 he accepted a position with State Farm as an agency field executive

10  ("AFE").   He signed a letter agreement which described his employment as at-will.  The

11  letter agreement contained no reference to the right to return to agency status, but he

12  understood that it was standard practice for AFEs and agency field consultants ("AFCs ") to

13  be given an agency if they wanted it.

14         In January of 2000, Defendant Gonzales became regional vice president of the

15  Sunland region, where Killingsworth was employed as an AFE.  Gonzales' subordinate Mike

16  Dannewitz became vice president of agency, and Killingsworth's direct supervisor, in March

17  of 2000.  In a June 12, 2001 meeting with Gonzales, Killingsworth learned of allegations

18  concerning his management style and conduct made against him by some of his subordinates.

19  Gonzales instructed Killingsworth not to return to his agency field office ("AFO") or have

20  any contact with his employees.

21         On June 15, 2001, Killingsworth wrote a letter to Dannewitz requesting a State Farm

22  agency. On June 29, 2001, Dannewitz demoted Killingsworth from AFE to AFC due to the

23  complaints about his management style and conduct. Killingsworth claims that he accepted

24  the demotion because Dannewitz promised him that he would receive the Dennis Eggert

25  State Farm Agency in January of 2002.   On September 24, 2001, Gonzales gave

26  Killingsworth a letter informing him that he was to be demoted to agency field specialist

27  ("AFS"). However, this second demotion was later withdrawn.  Killingsworth resigned from

28

1    his employment with State Farm on October 29, 2001, and took an agency with American

2    Family Insurance.

3         Killingsworth filed charges with the EEOC on December 19, 2001, alleging age and

4    religious discrimination and retaliation.  On September 17, 2003, he filed suit against State

5    Farm and Gonzales in Maricopa County Superior Court, asserting state law contract and tort

6    claims and federal statutory claims of discrimination based on age, race, and national origin.

7    State Farm removed the case to federal court on October 6, 2003.

8         On State Farm's first motion for summary judgment, Killingsworth did not contest

9    summary judgment against his Title VII national origin claim and his 42 U.S.C. § 1985

10   claim.  This court granted summary judgment against Killingsworth's claim for improper

11   interference with contract but denied summary judgment against his breach of contract,

12   promissory estoppel, and implied covenant of good faith and fair dealing claims relating to

13   his not getting an agency when his employment with State Farm ended.  (Doc. # 193.)

14   **II.    EVIDENTIARY OBJECTIONS**

15        The local rules of this court require parties seeking or opposing summary judgment

16   to file a separate statement of "specific facts on which that party relies in support of the

17   motion" or "which the opposing party asserts, including those facts which establish a genuine

18   issue of material fact precluding summary judgment in favor of the moving party."  LRCiv

19   56.1(a).  Killingsworth has filed a 91 page, 370 paragraph, separate statement of facts. It

20   appears to be little short of trying his case as a whole on this motion.  (Doc. # 230.)

21        State Farm in turn has filed extensive objections to the admissibility of many of

22   Killingsworth's statements.  (Doc. # 270.)  Most of the objections need not be ruled on

23   because (1) the offered evidence would not affect the summary judgment outcome even if

24   admitted, such as evidence concerning the truth or not of each of the many employee

25   accusations against Killingsworth, (2) they are in fact objections to the statement of facts'

26   mis-characterization of the offered evidence itself, or (3) they are disguised further argument

27   beyond the page limits of the local rules, styled as relevance objections to the offered facts.

28   The court addresses specific objections only where necessary to the analysis given in this

order and otherwise denies the objections as unnecessary to the rulings on the motion for summary judgment.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment will be granted if the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A material fact is one that might affect the outcome of the suit under the governing law.  *Id*. at 248.  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  In considering a summary judgment motion the Court views the facts in the light most favorable to the nonmoving party and draws any reasonable inferences in the nonmoving party's favor. *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995).  However, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The Court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of the matters asserted.  *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).

## IV.   CONTRACT CLAIMS

Killingsworth contends that State Farm was contractually obligated to give him a State Farm agency upon his termination of employment and that it breached that obligation by deferring, rather than granting immediately, his request for an agency in 2001.  He grounds his contract claims on breach of express agreement, promissory estoppel, and breach of the implied covenant of good faith and fair dealing.

### A.   The Alleged 1980 Agreement

Killingsworth contends that when he was recruited as a management employee in 1980, he was promised an agency if and when he terminated as an employee.  It was common

for management employees to be able to return to agency if they so desired.  PSOF at ¶¶ 5, 208.   However, Killingsworth later signed four contracts with State Farm during his employment, the first three of which provided that the contract was the "sole agreement" between the parties.  DSOF at ¶¶ 9-10,13. For example, the March 1981 Agreement states:

> **VII Sole Agreement:**
> This Agreement terminates and supercedes any prior Agreement between the parties hereto and constitutes the sole and entire Agreement; and no change, alteration, or modification of the terms of this Agreement may be made except by agreement in writing of the parties hereto.

DSOF Ex. 123 at 2775.  Those merger clauses extinguished the alleged 1980 oral agreement. *Autonumerics, Inc. v. Bayer Industries, Inc.*, 144 Ariz. 181, 696 P.2d 1330, (Ariz. Ct. App. 1984) (interpreting merger clause).

## B.    The Alleged 2001 Agreement

Killingsworth also contends that on June 21, 2001, his immediate supervisor Mike Dannewitz specifically promised him the Dennis Eggert agency in exchange for "keeping his head down" and accepting a demotion without an appeal.  Motion at 4; PSOF at ¶ 209; PSOF Ex. 2 at ¶ 11, 12; DSOF at ¶ 74-75.  Killingsworth says the exchange occurred after "probably an hour discussion" in which Dannewitz and plaintiff went "through the numbers" related to the Dennis Eggert agency.  PSOF Ex. 1 at 174.   Dannewitz intended for Killingsworth to transition to the Dennis Eggert agency.  PSOF Ex. 9 at 214.  Before the meeting, on June 15, 2001, Dannewitz by letter also had made a written proposal to Gonzales that Killingsworth be given the Dennis Eggert agency.  PSOF Ex. 36 at 243-44; PSOF at ¶ 213; DSOF Ex. 63.

It is undisputed, however, that Dannewitz consistently told Killingsworth in conversations about returning to an agency that Dannewitz was making "no promises." Motion at 4.

As a general rule, "plain and common" disclaiming language will rebut the reasonableness of a party's conclusion that other party's statement was a commitment or

otherwise an offer.  *Roberson v. Wal-Mart Stores*, 202 Ariz. 286, 292, 44 P.3d 164, 170

(App. 2002).  Killingsworth admits that Dannewitz used such language:

> Q: And, in fact, what Mr. Dannewitz has said to you every time
> you've talked to him about the topic is no promises?
> A: What Mike Dannewitz said to me was trust me.
> Q: But he said no promises?
> A: Keep your head down.
> Q: And he said no promises?
> MR. GABROY: Object to form and foundation.
> MR. CHESTER: Correct.
> THE WITNESS: He did say no promises.
>              BY MR. CHESTER:
> Q: And Mr. Gonzales never promised you an agency?
> A: No.

PSOF Ex. 1 at 145; *see also* Motion at 4; DSOF at ¶¶ 59-60.   Killingsworth also

acknowledged as much in a conversation which he secretly tape recorded with Dannewitz

and Gonzales.

> [Dannewitz]: John, did I ever say to you that there was no
> promises made?
>              I recall our discussion, because it was in my office.
> I also told you that there was no promises being made,
> because your questions were, And what was available?
> Do you recall that?
> [Killingsworth]: Um-hum.  I think there's always been the
> discussion.
> [Dannewitz]: Did, did, did I ever, did I, did I say--
> [Killingsworth]: I think there's always been a discussion
> of no promises made.
> [Gonzales]: John, if, if, in fact, you remember that at the
> time, do you remember that it was, you know, it was
> always, I guess as Mike was saying, there were no
> promises.
> . . .
> [Dannewitz]: Well, I think that we did have a
> conversation in my office.  I think it said, (indiscernible)
> that I shared with you that we did talk about it.  It was the
> day of John's letter, and we did have, I had the templates
> right there, and we did talk about it.
> [Gonazales]: Uh-huh.
> [Dannewitz]: I mean, I was, but also at the end of every
> conversation saying there was (indiscernible) because we
> had not reached an agreement or a decision on what was,
> what was going to happen (indiscernible).
> [Killingsworth]: I think that (indiscernible) pattern and
> practice agency negotiations that I have been involved in
> for 23 years, there's never really a promise until there's a
> document signed.  That's why I'm a little bit confused
> about you being in the position that you tendered me an

> offer for the Reno agency. I know there was a discussion,
> but you know, I don't recall it as a for-real offer, Dave.

DSOF Ex. 16 at 22-24. *See also* DSOF Ex. 96.

Killingsworth asserts that he understood "no promises" to mean that he was unconditionally promised an agency except that "the parameters of the agency" might change and that State Farm is bound by his private understanding of the meaning of the words "no promises." PSOF Ex. 1 at 231-232. Killingsworth's purported private understanding of the universally repeated qualification of "no promises" to mean binding promises on the important details but not on lesser details is unreasonable. Killingsworth points to no "surrounding circumstances and the conduct of the parties," *Tabler III*, *v. Industrial Comm'n of Ariz.,* 202 Ariz. 518, 521, 47 P.3d 1156,1159 (App. 2000), that would fairly charge State Farm with knowing that Killingsworth was attaching a meaning to the words directly contrary to their plain and obvious meaning. "[M]utual assent is based on objective evidence, not on the hidden intent of the parties." *Hill-Shafer Partnership v. Chilson Family Trust*, 165 Ariz. 469, 474, 799 P.2d 810, 815 (Ariz. 1990); *see also The Hartford v. Industrial Comm'n*, 178 Ariz. 106, 112, 870 P.2d 1202, 1208 (App. 1994) (holding that where the words of an agreement admitted of no ambiguity, there was no lack of mutual assent merely because one party held a different understanding).

## C. Promissory Estoppel

There having been no promise, Killingsworth has no alternative claim for promissory estoppel. "The elements of promissory estoppel are a promise, which the promisor should reasonably foresee would cause the promisee to rely, upon which the promisee actually relies to his detriment." *Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 153 Ariz. 279, 282, 736 P.2d 13, 16 (App. 1987). "[Plaintiff] can only recover under the theory of promissory estoppel if he had a 'justifiable right to rely' on the alleged promise." *Higginbottom v. Arizona*, 203 Ariz. 139, 144, 51 P.3d 972, 977 (App. 2002) (citations omitted). "Reliance is justified when it is reasonable." *Carondelet Health Servs. v. Ariz. Health Care Cost Containment Sys. Admin.*, 187 Ariz. 467, 470, 930 P.2d 544, 547, (App.

1   1996).  Dannewitz's undisputed and uniform statement that he was making "no promises" as

2   a matter of law precludes the promissory foundation for promissory estoppel.

3          State Farm's standard practice of giving agencies to departing management employees

4   (presumably leaving on good terms) is not a promise to Killingsworth or one upon which he

5   would be entitled to rely.  *See Sutter Home Winery v. Vintage Selections*, 971 F.2d 401, 409

6   (9th Cir. 1992) (rejecting claims founded on "reliance on 'the historical conduct of

7   [defendant], . . . the custom in the industry, . . . and [defendant's] expression of good faith and

8   the viability of the ongoing relationship'" as "not the type of specific promises which can

9   support an action for promissory estoppel").

10          **D.     Good Faith and Fair Dealing**

11          Killingsworth's claim for breach of the implied covenant of good faith and fair dealing

12   requires little further comment.   "[T]he implied-in-law covenant of good faith and fair

13   dealing protects the rights of the parties to an agreement to receive the benefits of the

14   agreement that they have entered into."  *Wagenseller v. Scottsdale Memorial Hosp.*, 147

15   Ariz. 370, 385, 710 P.2d 1025, 1040 (Ariz. 1985).  It prevents a party from doing things to

16   deprive the other party indirectly of the express benefits of the contract.

17          Killingsworth's complaint seeks compensation for "losses in earnings, professional

18   status, and retirement and other employment benefits, which he would have received had

19   Defendant not breached the implied covenant of good faith and fair dealing."  Complaint p.6

20   at ¶ 29.  There was no promise of an agency to which the implied covenant could attach.  The

21   implied covenant does not generally limit the ability of an employer to fire an at-will

22   employee with or without cause.  *Wagenseller*, 147 Ariz. at 385, 710 P.2d at 1040.

23          The implied covenant does prevent an employer from discharging an at-will employee

24   and retaining compensation already earned.  *Fortune v. National Cash Register Co.*, 373

25   Mass. 96, 103, 364 N.E.2d 1251, 1257 (1977) (finding bad faith termination charge was

26   appropriate where salesman was terminated to avoid paying him his commissions on prior

27   sales).  But the future "earnings, professional status, and retirement and other employment

28   benefits" Killingsworth seeks are not yet earned and owing and are not an obligation of the

employer under *Wagenseller*. *See Broomfield v. Lundell*, 159 Ariz. 349, 354, 767 P.2d 697, 702 (Ariz. Ct. App. 1988) ("[Plaintiff] alleged that she has been and is being deprived of income in the form of wages, retirement benefits, future wages, seniority, and other benefits due her as a worker . . . . [T]he damages she sought to recover exclusively reflect[] a claim for prospective employment, which *Wagenseller* makes clear is relief to which she was not entitled.").

State Farm and Gonzales are entitled to summary judgment on Counts II, III, and IV.

## V. STATUTORY CLAIMS FOR 42 U.S.C. § 1981 RACE DISCRIMINATION AND ADEA AGE DISCRIMINATION

### A. Facts Specific to Killingsworth's Statutory Claims

Killingsworth alleges  42 U.S.C. § 1981 race discrimination, contending that State Farm's affirmative action program influenced State Farm's officers' decisions to demote and constructively discharge him.  State Farm justifies its actions as responding to numerous and serious charges of abuse, racism, and sexism from Killingsworth's subordinates, past and present.  State Farm argues that Killingsworth has failed to present any direct evidence or specific and substantial circumstantial evidence that State Farm's articulated non-discriminatory reasons were pretexts for race or age discrimination.

### 1. State Farm's Affirmative Action Program

Throughout 2001 State Farm had a general affirmative action policy to encourage diversity among its employees.  The policy promoted diversity in both new hires and promotion into management positions. (PSOF Ex. 37 at 2, Ex. 38 at 1, Ex. 39 at 97.)

State Farm's policy was partially implemented through its "Emerging Markets" program.   This program was created to increase State Farm's marketing presence in Hispanic, African-American, and Asian customer markets.  (PSOF Ex. 6 at 25-26.)  In order to do so, managers were encouraged to hire more employees of those markets' ethnicities. (PSOF Ex. 41 at 1; Ex. 6 at 26-27.)  The number of Hispanic employees appropriate for State Farm employment, for example, was understood to be commensurate with the number of Hispanic people in the general population.  (PSOF Ex. 40 at 100.)

1    Additionally, in 2000 through the Senior Management Incentive Program ("SMIP"),

2    the upper management of State Farm was incentivized monetarily to hire and promote

3    minorities.  Executives sought to meet State Farm's "Process Goals" for the year, and their

4    success or failure in doing so could effect their SMIP yearly monetary bonus by up to 20%.

5    (PSOF Ex. 38 at 1.)  In both 2000 and 2001, "Diversity" was one of the three "Process Goals"

6    for the year.  (PSOF Ex. 38 at 1; PSOF Ex. 40 at 100.)

7              **2.       State Farm's Justification for Its Actions**

8    For six months in 2001 Killingsworth's superiors received a tide of complaints about

9    him from his subordinates.  The complaints were that Killingsworth abused and threatened

10   them and made racist and sexist comments.  Before then Killingsworth had worked for 19

11   years without reprimand.  The complaints are summarized as follows.

12             **a.       Pre-Demotion Complaints**

13   On January 2, 2001, Marian Enriquez, a temporary employee in Killingsworth's AFO,

14   filed a charge of discrimination with the Arizona Attorney General's Office and the EEOC.

15   (DSOF at ¶ 33.)  Enriquez alleged that Killingsworth had asked her to change her name to

16   one easier for Caucasians to pronounce and told her that the "higher-ups were Caucasian and

17   they did not like to learn Hispanic names." (*Id.*; PSOF at ¶ 149.)  After State Farm's in-house

18   counsel interviewed everyone in Killingsworth's AFO and everyone denied that

19   Killingsworth had made such statements in their hearing, Gonzales formally denied

20   Enriquez's charges against Killingsworth.  (PSOF at ¶¶ 156, 157.)

21   The next complaint came in May when Marcella Busto, a trainee agent in

22   Killingsworth's AFO, took an "Open Door" to Mike Dannewitz.  (DSOF at ¶ 42.)  The "Open

23   Door" is State Farm's procedure for employees to choose any level of management or human

24   resources to which to present workplace concerns. (DSOF at ¶ 30.)  By taking an "Open

25   Door," Busto was able to raise her concerns with someone other than Killingsworth himself,

26   her immediate supervisor.

27   Busto said Killingsworth did not support her and demoralized her.  She had not

28   complained earlier because he intimidated her and she feared him.  He had told her that

1    Filipinos are the laziest people in the world.  Busto is herself a Filipina.  (DSOF Ex. 3 at 110-

2    14.)

3         In the following month Darrell Eisenbraun complained to Mike Dannewitz that the

4    working conditions in the AFO were intolerable.  The conditions had escalated in their

5    hostility over a six-year period that he had been working with Killingsworth.  Killingsworth's

6    remarks and expectations were stated in a very hostile manner and constituted discrimination

7    in his opinion.  (DSOF Ex. 30 at 0021.)  Eisenbraun complained that Killingsworth had high

8    staff turnover and expected interns to claim no overtime yet do certain evening and weekend

9    work and study.  (DSOF Ex. 30 at 0022.)

10        Tony Acketz was the next to seek an Open Door to complain about Killingsworth.

11   He told  David Gonzales that on June 8 he was summoned into John Killingsworth's office

12   and was questioned whether he knew what was transpiring between Killingsworth and AFC

13   Darrell Eisenbraun, between whom there was friction.  Killingsworth disclosed some of his

14   issues with Eisenbraun and demanded that Acketz take a stance in support of Killingsworth's

15   efforts to remediate Darrell Eisenbraun's deficiencies.  Acketz responded that he had no

16   opinion as to the shortcomings of Darrell Eisenbraun, to which  Killingsworth responded, "If

17   you support me, you will reap financial rewards.  If you do not support me, you will lose

18   your job.  If you do not support me then you are against me."  Acketz  was amazed that he

19   had been threatened with his position.

20        Acketz also related that Killingsworth threatened Darrell Eisenbraun or at a minimum

21   berated him in front of the rest of the AFO staff.  He was a dictator and had stated on

22   occasion it is either his way or the highway.

23        Acketz further stated that he was not the only one afraid of Killingsworth.  Others

24   included Linda Farmer, Chuck Kelly, and Eric Hamilton–all would say they have been

25   intimidated or threatened by Killingsworth.  He had asked Linda Farmer to voice her

26   complaint, but she refused because she feared she would lose her job.  Linda Farmer had told

27   Acketz that she and Chuck Kelly were having a sexual relationship, on which Killingsworth

28   had commented critically.  Killingsworth had also commented to Acketz that Linda Farmer

1    "still dates black men."  Chuck Kelly, an African-American trainee agent, shared with

2    Acketz that Killingsworth told him that his grandparents were KKK members and that he

3    descends from a family of slave owners.  Acketz believed that Kelly was incensed by the

4    remark.  Killingsworth had made the same comment to Acketz.  (DSOF Ex. 31 at 0060-61,

5    109-112.)

6        Acketz said he sought the Open Door because Killingsworth "liked to play games"

7    and lied to Acketz on a couple of occasions.  Acketz did not trust him.  He did not feel like

8    it was a comfortable work environment, and he felt like his job was on the line.  (DSOF Ex.

9    1 at 100-01.)

10    After Acketz's Open Door with Gonzales, Gonzales phoned Darrell Eisenbraun, who

11    again complained about Killingsworth's demoralizing and brutal management style.  (DSOF

12    Ex. 32 at 0062.)  Eisenbraun stated that he was fearful for his job, had been threatened

13    frequently, and had been berated and embarrassed by Killingsworth before the AFO staff.

14    (*Id.*)  Eisenbraun also told Gonzales that the trainee agents were afraid of Killingsworth.

15    (*Id.*)  Finally, Eisenbraun told Gonzales that Killingsworth had made ethnically insensitive

16    remarks, including those alleged by Marian Enriquez in her EEOC complaint.  (DSOF at ¶

17    51.)

18    The next complaint came in Gonzales and Dannewitz's meeting with Linda Farmer

19    on June 12, 2001.  Farmer told Gonzales and Dannewitz that Killingsworth threatened to fire

20    her if she did not side with Killingsworth in Killingsworth's dispute with Darrell Eisenbraun.

21    (DSOF at ¶ 52.)  Farmer also told them about what she considered racially insensitive

22    comments made by Killingsworth, including telling Chuck Kelly that Killingsworth wanted

23    Kelly to be the best "black agent."  (DSOF at ¶ 54.)  Farmer corroborated that Killingsworth

24    would verbally abuse Darrell Eisenbraun.  (DSOF at ¶ 54; PSOF at ¶ 117.)

25    Gonzales, Dannewitz, and Murphy held a meeting with Killingsworth later that day,

26    June 12, after which Killingsworth was placed on administrative leave.  (DSOF at ¶ 55.)

27    With investigation more complaints about Killingsworth surfaced.  On June 20, 2001, Lora

28    Murphy spoke with three former secretaries from Killingsworth's AFO: Lisa Shearon, Cheryl

1    Reed, and Crissy Hammond.  (DSOF at ¶ 63.)  The interviews led Murphy to suggest to

2    Gonzales that Killingsworth be terminated.  (DSOF at ¶ 70.)

3          Lisa Shearon informed Murphy that Killingsworth had violated company policy;

4    Shearon had worked overtime and was not paid for the time.  (DSOF at ¶ 64.)  Shearon also

5    informed Murphy that the atmosphere of Killingsworth's AFO had been stressful and hostile

6    and that Killingsworth yelled and screamed at her publicly and was degrading.  (DSOF at ¶

7    64.)  Cheryl Reed also described her employment at Killingsworth's AFO as stressful and

8    charged that Killingsworth did not work well with staff.  (DSOF at ¶ 65.)  Reed asserted that

9    Killingsworth was a poor communicator who would berate staff and not show staff any

10   appreciation.  (DSOF at ¶ 66.)  Crissy Hammond asserted that Killingsworth had a bad

11   temper and would slam things around in a rage.  (DSOF at ¶ 68.)  Hammond also stated she

12   had not been compensated for overtime, corroborating Lisa Shearon's allegations that

13   Killingsworth had violated company policy in this respect.  (DSOF at ¶ 68.)

14         Lisa Shearon later contacted Murphy after remembering another item:   that

15   Killingsworth owned one of the buildings a State Farm agent rented and had raised the rent

16   once State Farm began paying the rent.  (DSOF at ¶ 64.)

17         On June 26, 2001, Gonzales and Dannewitz met with Killingsworth again.

18   Killingsworth admitted to telling Chuck Kelly that he wanted him to be the best "black

19   agent," admitted to having his wife alter an expense account for him, and admitted to having

20   not properly disclosed in the manner required by company policy his ownership of a building

21   where a State Farm agent officed. (DSOF at ¶ 72.)   Dannewitz drafted a demotion letter

22   stating that Killingsworth would be demoted as a result of his management style and the

23   environment he created (DSOF at ¶ 73), a letter Killingsworth signed on June 29. (DSOF at

24   ¶ 76.)

25                          **b.     Post-Demotion Complaints**

26         On August 8th Marcella Busto complained again, this time in a letter to Gonzales.

27   The letter described Killingsworth's racially insensitive and otherwise inappropriate remarks.

28   Busto alleged that Killingsworth had, among other things,  said that various lesbians were

1    "promoting their kind" within State Farm, said that Filipinos are the "laziest people in the

2    world," and called Lynn Buss, a female trainee agent, "Blondie."  (DSOF at ¶ 81.)

3         Additional disturbing charges were received on August 13, 2001, from Geraldo

4    Chavez, a former trainee agent under Killingsworth.  (DSOF at ¶ 85.)  Killingsworth

5    purported to negotiate the lease for Chavez's office.  (*Id.*)  Killingsworth had told Chavez

6    that Killingsworth could work out a remodeling deal with the owners of the building whereby

7    the remodeling Chavez needed to do would cost Chavez nothing if Chavez signed a 5-year

8    instead of a 3-year lease.  (DSOF Ex. 36 at 00236.)  Only later did Chavez find out, after

9    signing the 5-year lease, that Killingsworth owned the building.  (*Id.*)  Chavez felt that

10   Killingsworth had lied to him (DSOF Ex. 4 at 103) and that Killingsworth's conduct was

11   unethical if not illegal.  (DSOF Ex. 92 at 00383.)  Chavez also described Killingsworth as

12   dictatorial, sexist, and impossible to work with.  (*Id.*)

13        Further troublesome information reached State Farm on August 16, 2001.  Carra

14   Simmons, a previous trainee agent under Killingsworth, sent an email to Mike Dannewitz

15   describing some of her experiences.  (DSOF at ¶ 90.)  Simmons indicated that she was forced

16   to lease the office space Killingsworth chose for her and he instructed her to keep quiet her

17   knowledge of his ownership interest.  (DSOF Ex. 37 at 00288.)

18        In a meeting with Gonzales and Dannewitz on August 17, 2001, Killingsworth

19   acknowledged that, with respect to not having disclosed his ownership of agent-leased space,

20   "[l]ooking back it was a bad decision."  (DSOF Ex. 39 at 00297.)

21        On October 22, 2001, Gonzales, Murphy, and Dannewitz met with Killingsworth for

22   the last time.  (DSOF at ¶ 110.)  Killingsworth secretly tape-recorded the meeting.  (*Id.*)  In

23   the meeting, Killingsworth was informed that he would not be demoted a second time to AFS

24   after all.  (DSOF at ¶¶ 112-113.)  Instead, Gonzales urged Killingsworth to put the matter

25   behind him and move forward in a positive and professional manner.  (DSOF at ¶ 116.)

26   Further, Gonzales told Killingsworth that if Killingsworth developed a good track record in

27   the AFC position, Killingsworth would be considered for an agency after 18 months. (DSOF

28   at ¶ 117.)

1          **B.     The Legal Standards**

2          Although Killingsworth's claims are based on the ADEA and 42 U.S.C. § 1981, claims

3    for intentional discrimination brought under these statutes follow the Title VII  burden-

4    shifting framework.  *See Doe v. Kamehameha Schools/ Bernice Pauahi Bishop Estate*, 416

5    F.3d 1025, 1036 (9th Cir. 2005) (holding that Title VII's *McDonnell Douglas* burden-shifting

6    framework is proper for Section 1981 claims); *White v. Washington Public Power Supply*

7    *System*, 692 F.2d 1286, 1288-89 (9th Cir. 1982) (applying the *McDonnell Douglas* burden-

8    shifting framework of Title VII doctrine to a 42 U.S.C. § 1981 claim); *Coleman v. Quaker*

9    *Oats Co.*, 232 F.3d 1271, 1280-81 (9th Cir. 2000) (applying the general *McDonnell Douglas*

10   burden-shifting framework of Title VII doctrine to an ADEA claim).   The framework for

11   allocating  the  burden  of  proof  in  such  cases  is  the  framework  originally  laid  out  in

12   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  First, the plaintiff must

13   establish a *prima facie* case of discrimination.  *Lowe v. City of Monrovia*, 775 F.2d 998, 1005

14   (9th Cir. 1985).  If the plaintiff does so, then the burden shifts to the defendant to articulate

15   a legitimate nondiscriminatory reason for its employment decision.  *Id.*   Then "in order to

16   prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse

17   employment decision is a pretext for another motive which is discriminatory."  *Id.*

18          **C.     Killingsworth's Prima Facie Case**

19          On summary judgment, the degree of proof necessary to "establish a prima facie case

20   for Title VII . . . is minimal and does not even need to rise to the level of a preponderance of

21   the evidence."  *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 659 (9th Cir. 2002)

22   citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); *Lyons v. England*, 307

23   F.3d 1092, 1112 (9th Cir. 2002) (same); *see also Coleman v. Quaker Oats Co.*, 232 F.3d

24   1271, 1281-82 (9th Cir. 2000) ("Nevertheless, despite the weaknesses in the evidence offered

25   by Jeney and Gentile to establish their prima facie cases, given the low threshold required,

26   we assume, without deciding, that all three - Jeney, Gentile and Coleman - have established

27   such a case.").  Killingsworth need only present enough evidence to give rise to an inference

28   of unlawful discrimination.  *See Lowe*, 775 F.2d at 1005.  There are generally two ways for

Killingsworth to give rise to such an inference: "The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas Corp. v. Green* . . . or by more direct evidence of discriminatory intent." *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (citations omitted). The court finds that Killingsworth has satisfied the *McDonnell Douglas* factors and thus has established a prima facie case, without need at this stage to show direct evidence of discriminatory intent.

The *McDonnell Douglas* factors the plaintiff must show are "that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably . . . ." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

### 1.    Member of Protected Class

Killingsworth has adequately asserted that he is Caucasian. *See Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 659 (9th Cir. 2002) ("[Plaintiff], despite being white, is a member of a protected class. It is well-established that Title VII applies to any racial group, whether minority or majority."); DSOF at ¶ 1.

### 2.    Qualified for Position

To show that he was qualified for his position, Killingsworth's burden is very light, and even his self-assessment is relevant evidence. *Aragon*, 292 F.3d at 659-660 (holding that at the prima facie stage plaintiff's self assessment is relevant and the burden on plaintiff is minimal); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (assuming that plaintiffs fulfilled their requirements under this factor, "given the low threshold required," even though plaintiffs submitted little more than self-evaluations).

Killingsworth also satisfies this prong of the prima facie test. He had worked at the position for years, and his production at the Phoenix AFO was impressive. (PSOF at ¶ 9 at 141.) He achieved the 'Inner Circle' award at least three times, including in 2000, a distinction accorded only to the most accomplished AFEs. (*Id.*) Killingsworth garnered other awards and accomplishments. (PSOF at ¶ 10-11.) The courts must accord "flexibility"

to plaintiffs to meet this factor. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 915-16 (9th Cir. 1996) (holding that despite customer and employee complaints about plaintiff, the district court had been overly rigid in finding plaintiff did not meet the qualification factor).

State Farm argues that, because Killingsworth casts this as a discharge case, a special rule for prima facie case applies and Killingsworth does not meet that special rule.  The Ninth Circuit in *Pejic v. Hughes Helicopters*, 840 F.2d 667, 672 (9th Cir. 1988), articulated for such cases prima facie elements different from those of *McDonnell Douglas.  Pejic* stated the following requirements a plaintiff must show in discharge cases:  "1. he was within the protected class; 2. he was performing his job well enough to rule out the possibility that he was fired for inadequate job performance; and 3. his employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills."  *Id.  Pejic* appears to import into the plaintiff's prima facie case the need to disprove the truth of the employer's stated non-discriminatory reason under the third stage of *McDonnell Douglas*.

The continuing force of  the second factor of the *Pejic* standard as a specification of the general "qualified for the position" prong of *McDonnell Douglas* is assumed in dictum in *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1062 n.8 (9th Cir. 2002).  The *Villiarimo* court stated:

> As the district court correctly observed, it is not clear that Villiarimo has produced sufficient evidence regarding the second prong, i.e., that she was qualified for the position. Villiarimo admits that Aloha told her that she was fired because she did not perform her job satisfactorily.  She does not dispute that . . . she failed to disconnect the GPU cord before signaling Harvest to drive his tug away.  Thus, it is not clear that Villiarimo was performing her job "well enough to rule out the possibility that she was fired for inadequate job performance." Pejic v. Hughes Helicopters, Inc. . . . .

*Id.* at 1062 n.8 (internal citations omitted) (alterations added).  However, *Pejic*'s second factor may be in doubt after *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir. 2002), which rejected the *Pejic* second factor in determining *McDonnell Douglas*'s "qualified for the position" prong.  The court reasoned:

Second, [plaintiff] must show that he was qualified for his position as a casual pitcher. The district court found that [plaintiff's] evidence on this point fell short of that necessary to establish a prima facie case – namely, Aragon 'failed to show that he was doing his job well enough to eliminate the possibility that he was laid off for inadequate job performance' . . . The district court's analysis seems to conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing [plaintiff] must make at the third stage of the McDonnell Douglas inquiry to demonstrate that [defendant's] reasons for laying him off were pretextual.

*Id.* at 659 (citations omitted).

The tension continues in *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004), which appears to return to *Pejic*, stating, "To survive summary judgment on his disparate treatment claim, [plaintiff] must establish that his job performance was satisfactory and provide evidence, either direct or circumstantial, to support a reasonable inference that his termination was discriminatory." *Id.* at 603.

Though it is not settled in this Circuit, this court reads the *Pejic* test as the Sixth Circuit did in *Cicero v. Borg-Warner*, 280 F.3d 579, 585 (6th Cir. 2002):

A court must evaluate whether a plaintiff established his qualifications *independent* of the employer's proffered nondiscriminatory reasons for discharge. *See Cline*, 206 F.3d at 660-61 ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage ... a court must examine plaintiffs' evidence *independent* of the nondiscriminatory reason produced by the defense as its reason for terminating plaintiff."). In short, a court must be careful not to conflate the distinct stages of the *McDonnell Douglas* test. The district court here did just that.

*Id.* at 585 (alterations in original) (emphasis added) (internal quotations omitted). Even if the *Pejic* second prong is incorporated into the prima facie case, the qualifications prong of the prima facie case must still be evaluated on plaintiff's evidence independently of the "nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Id.* Looking independently at the evidence of Killingsworth's long-time historical success in the AFE position discussed above and without paying attention to State Farm's allegations, Killingsworth has presented a prima facie case.

1               **3.      Adverse Employment Action**

2        Killingsworth's June 29, 2001 demotion is an adverse employment action and is so

3   conceded by State Farm.  Killingsworth argues that the rescinded and never-implemented

4   September 24, 2001 second demotion and  Killingsworth's "constructive discharge" are also

5   adverse employment actions.

6        On September 21, 2001, Gonzales informed Killingsworth that he would be demoted

7   a second time to an AFS position.  DSOF at ¶ 99.  Gonzales later rescinded the demotion, and

8   Killingsworth never received the lower AFS salary or reported to work as an AFS.  DSOF

9   at ¶ 100.  The rescinded demotion is not adverse employment action.  *See Brooks v. City of*

10  *San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (rejecting allegedly adverse action because it

11  was subject to modification by the employer).

12       "[C]onstructive discharge occurs when the working conditions deteriorate, as a result

13  of discrimination, to the point that they become 'sufficiently extraordinary and egregious to

14  overcome the normal motivation of a competent, diligent, and reasonable employee to remain

15  on the job to earn a livelihood and to serve his or her employer.'"  *Brooks*, 229 F.3d at 930

16  (citations omitted).   The test is whether "looking at the totality of circumstances, 'a

17  reasonable person in the employee's position would have felt that he was forced to quit

18  because of intolerable and discriminatory working conditions.'"  *Watson v. Nationwide Ins.*

19  *Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (citations and alterations omitted).  The reasonable

20  person standard is an objective standard.  *Id.* at 361.  Because the issue turns on the particular

21  facts of each case, the "determination whether conditions were so intolerable and

22  discriminatory as to justify a reasonable employee's decision to resign is normally a factual

23  question left to the trier of fact."  *Id.*  Nonetheless, when perceiving the evidence in the light

24  most favorable to the plaintiff the court "cannot see how a reasonable trier of fact could find

25  that [a plaintiff] was driven from the workplace," *Brooks*, 229 F.3d at 930, it is proper for a

26  court to find that there was no constructive discharge as a matter of law.  *Id.*

27       Killingsworth was as a matter of law not constructively discharged for at least two

28  sufficient reasons.  First, Killingsworth's own statements and conduct refute the argument

that his working conditions were "intolerable."  Immediately after being demoted, plaintiff wrote an email to Dannewitz that read as follows:

> Mike:
> Please be advised that I have a conversation with Joe Eberson today concerning my job reassignment.  I advised Joe the I [sic] supported and agreed with the decision.  That I am now a consultant and want to do that job to the best of my ability and that I not [sic] comfortable discussing the details of the matter.

DSOF Ex. 67 at 0003.  Later, in his October 22, 2001 meeting with Dannewitz and Gonzales, Killingsworth described the new position as "very viable."  DSOF Ex. 16 at 8.  And when Killingsworth finally left State Farm, he did so in a calculated way.

Before resigning, Killingsworth remained on the supposedly intolerable job for four months.  He took the time to interview and secure an agency with American Family, a different insurer.  DSOF at ¶ 123.  He expressed his excitement about an appointment as an American Family agent in an October 13 email stating "I am very excited about the opportunity with American Family and the plans we discussed."  DSOF Ex. 25 at 0073.  His appointment with American Family was later confirmed by email on October 24,  DSOF Ex. 23 at 0034, five days before he resigned from State Farm.  On this issue, *Wagner v. Sanders Assocs.*, 638 F. Supp. 742, 745-46 (C.D. Cal. 1986), is directly on point.  "If [the employee] were allowed to state a claim for wrongful discharge on these facts, the suggestion would be that any employee who suffered an affront at the hands of his employer could then commence a job hunt, retaining his job if he could not find another and bringing a lawsuit if he could."  *Id.*  As the *Wagner* court held, "It must be one or the other right from the beginning."  *Id.*      A second independent reason Killingsworth was not constructively discharged is that State Farm's actions were eminently reasonable in light of the multitude of complaints made by Killingsworth's subordinates.  Reasonable reactions on the part of an employer to complaints raised by employees about a manager's conduct do not make for a constructive discharge, even if the employer's actions distress the manager.  *Lojek v. Thomas*, 716 F.2d 675, 682 (9th Cir. 1983).  Unfair and intolerable employer conduct is thus the touchstone to constructive discharge; unfavorable working conditions in and of themselves

do not suffice.  "[E]very job has its frustrations, challenges, and disappointments; these inhere in the nature of work.  An employee is protected from unreasonably harsh conditions, in excess of those faced by his or her coworkers.  He or she is not, however, guaranteed a working environment free of stress."  *King*, 65 F.3d at 768.

Killingsworth's own distress, arising naturally from his coworkers' and superiors' doubting his integrity and capabilities, does not support constructive discharge without unreasonable employer conduct.  *See Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989) ("It was not unreasonable for [plaintiff] to feel uncomfortable in his situation.  His subjective personal discomfort, however, was most likely not the product of any action by appellees but, rather, the product of human nature.").  The allegations of Killingsworth's subordinates and Gonzales' and Dannewitz' hesitation to believe him would reasonably upset any twentieth-year employee.  However, an employer's inherently reasonable investigation and action in response to repeated serious employee complaints cannot support a finding that plaintiff was "forced to quit."  *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996).

### 4.     Similarly Situated Individuals

Killingsworth must submit evidence of more favorable treatment of a similarly situated individual outside his protected class or other circumstances surrounding the adverse employment action that give rise to an inference of discrimination.  *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).  Given the light burden faced by plaintiff at this stage of the burden-shifting framework and since State Farm has not challenged Killingsworth on this point, the court assumes Killingsworth has met his burden on this element.

### D.     State Farm's Articulated Nondiscriminatory Reason

Since Killingsworth has established a prima facie case, the burden shifts to State Farm to articulate a legitimate nondiscriminatory reason for its actions.  *See Lowe*, 775 F.2d at 1005.  State Farm has clearly done so.  State Farm has presented a well-documented history of allegations against Killingsworth by his subordinates and a reasonable response to prevent

1   further harm to its business, to protect employees, and to forestall liability from

2   Killingsworth's action as a manager of employees.

3   **E.    The Third Stage:  Pretext**

4   Given State Farm's articulation and ample substantiation of non-discriminatory

5   reasons for its actions, Killingsworth must present evidence that raises a genuine factual

6   question as to whether, viewing the evidence in the light most favorable to him, State Farm's

7   stated reason is pretextual.  *See, e.g.*, *Chuang v. University of California Davis Bd. of

8   Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000).  To do so, Killingsworth can present direct

9   evidence of discrimination or specific and substantial circumstantial evidence of

10  discrimination.  *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

11  **1.    Direct Evidence: The Affirmative Action Plan**

12  "Direct evidence is evidence which, if believed, proves the fact of discriminatory

13  animus *without inference or presumption*."  *Aragon*, 292 F.3d at 662 (alterations, quotations,

14  and citations omitted); *see also Godwin*, 150 F.3d at 1221 (same).  Generally, direct evidence

15  "consists of clearly sexist, racist, or similarly discriminatory statements or actions by the

16  employer."  *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).  The

17  classification as "direct" evidence is important: where direct evidence is present, "a triable

18  issue as to the actual motivation of the employer is created even if the evidence is not

19  substantial." *Aragon*, 292 F.3d at 663 n.5.  By contrast, circumstantial evidence showing that

20  the employer's proffered motives were not the actual motives must be "specific" and

21  "substantial" to create a triable issue.  *Godwin*, 150 F.3d at 1222.

22  State Farm's affirmative action plan is not direct evidence of discrimination, for two

23  reasons.  First, Killingsworth has not carried his burden to show the plan is invalid.  Second,

24  there is no evidence that State Farm acted pursuant to the plan in demoting him.

25  Both the Fifth and Eleventh Circuits have held that that the existence of an affirmative

26  action plan that is invalid under Title VII constitutes direct evidence of discrimination.  *See

27  Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001); *Frank v. Xerox Corp.*,

28  347 F.3d 130, 137 (5th Cir. 2003).  "[T]he existence of an affirmative action plan, when

1   combined with evidence that the plan was followed in an employment decision, is sufficient

2   to constitute direct evidence of unlawful discrimination *unless the plan is valid.*"  *Bass,* 256

3   F.3d at 1110 (emphasis added).  The plaintiff bears the burden of proving the plan invalid.

4   *Doe v. Kamehameha Schools/ Bernice Pauahi Bishop Estate*, 416 F.3d 1025, 1040 (9th Cir.

5   2005) ("As a preliminary matter, we note that the plaintiff generally bears the burden of

6   establishing the invalidity of an affirmative action plan challenged under Title VII") (citing

7   *Johnson v. Transportation Agency of Santa Clara*, 480 U.S. 616, 626 (1987));  *Bass*, 256

8   F.3d at 1115. On summary judgment the plaintiff must present evidence of the essential

9   requirements of invalidity for the affirmative action plan to serve as direct evidence of

10  discrimination.

11      To be valid an affirmative action plan must "(1) respond to a manifest imbalance in

12  its work force; (2) not create an absolute bar to the advancement of the non-preferred race

13  or unnecessarily trammel their rights; and (3) do no more than is necessary to achieve a

14  balance."  *Kamehameha Schools*, 416 F.3d at 1041.  Killingsworth fails to address this

15  standard or even the issue of the policy's validity.  His suggestion that State Farm's

16  affirmative action policy is "direct" evidence of racial discrimination fails on summary

17  judgment for lack of evidence or analysis.

18      Killingsworth also submits nothing to show that State Farm was acting pursuant to the

19  policy when it demoted Killingsworth.  The "mere existence of an affirmative action plan by

20  itself does not constitute direct evidence of discrimination unless there is also evidence that

21  the employer acted pursuant to the plan in making employment decisions."  *Bass,* 256 F.3d

22  at 1110; *see also Cerrato v. San Francisco Community College Dist.*, 26 F.3d 968, 976 (9th

23  Cir. 1994) ("Other circuits have held–and common sense tells us–that the mere fact of an

24  affirmative action plan's existence is not relevant to proving discrimination unless the

25  employer acted pursuant to the plan.").

26      There is no evidence that State Farm's affirmative action plan extended to demotion

27  or termination of State Farm's current employees to create openings for minority candidates

28  to fill.  All the evidence concerning the Senior Management Incentive Program in its 2000

- 23 -

1    and 2001 forms and concerning the Emerging Markets programs addresses hiring or
2    promotion into management.   Although Gonzales referenced use of census data in
3    determining how many minority employees would be optimal for State Farm, there is no
4    evidence that those benchmarks informed anything beyond hiring and promotion. PSOF Ex.
5    36 at 101-02; PSOF Ex. 40 at 3, 1.   It would be speculation to say that the company's
6    affirmative action plan extended to firing or demotions.   *Cf. In re Birmingham Reverse*
7    *Discrimination Employment Litigation*, 20 F.3d 1525, 1542 (11th Cir. 1994) (distinguishing
8    between hiring, layoff, and promotion provisions in an affirmative action plan).

9         Accordingly, Killingsworth has presented no direct evidence of discrimination.

10              **2.     Circumstantial Evidence of Discrimination**

11        Although Killingsworth has not produced "direct" evidence of discriminatory motive,
12   he can still defeat summary judgment by presenting "specific" and "substantial"
13   circumstantial evidence of pretext.   *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th
14   Cir. 1998).   Killingsworth "may establish pretext through evidence showing that [the
15   employer's] explanation is unworthy of belief or through evidence showing that
16   discrimination more likely motivated its decision."   *Pottenger v. Potlach Corp.*, 329 F.3d
17   740, 746 (9th Cir. 2003); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir.
18   1996) (noting that a plaintiff can show a factual question as to pretext "in two ways: (1)
19   indirectly, by showing that the employer's proffered explanation is 'unworthy of credence'
20   because it is internally inconsistent or otherwise not believable, or (2) directly, by showing
21   that unlawful discrimination more likely motivated the employer).   "These two approaches
22   are not exclusive; a combination of the two kinds of evidence may in some cases serve to
23   establish pretext so as to make summary judgment improper."   *Chuang*, 225 F.3d at 1126;
24   *see also Pottenger*, 329 F.3d at 746 ("[Plaintiff] need not rely on only one type of evidence,
25   and he has offered evidence both to cast doubt on [defendant's] credibility and to show a
26   discriminatory motive.").

27

28

1

2

### a.   Evidence That State Farm's Explanation Is Unworthy of Belief

Killingsworth fails to present evidence that State Farm's articulated non-discriminatory reason for demoting him is unworthy of belief.  To some extent he mis-conceives what are those reasons and what is the court's proper inquiry.  In his 91-page, 370 paragraph Statement of Facts, supported by  exhibits a foot high, Killingsworth attempts to try much of his case on this motion for summary judgment.  He would have the court redetermine *de novo* the credibility of every complainant and the truth or untruth of every incident, charge, accusation, and complaint leveled against Killingsworth.  For this he says there are disputes of fact, inference, and credibility entitling him to a jury trial.

That is not the court's inquiry in an employment discrimination case, for State Farm need not have resolved every fact, inference, and dispute of credibility to remove Killingsworth from his supervisory position and put him in another.  If State Farm did resolve all or any of those disputes, it did not have to resolve them "correctly" according to some standard of ultimate metaphysical truth.  State Farm need only have not discriminated by race or age in what it did or how it went about doing it.

There is no reasonable basis to dispute that State Farm actually perceived pervasive and grave complaints from Killingsworth's employees, current and former, of a department poisoned with animosity, mismanagement, destruction of employee confidence and morale, and charges of Killingsworth's overt racism and sexism.  Moreover, though it may be debatable in specifics and State Farm need not have been correct in its underlying factual premises for the demotion, that general constellation of underlying facts is not even arguably unworthy of belief.

Killingsworth's evidence on summary judgment does not raise a jury-submissible challenge to State Farm's belief that it had a serious management problem in need of action.  Rather, he argues that those who complained about him materially exaggerated or falsified all of it, that the ADEA and § 1981 required State Farm to conclude that the charges were a vast conspiracy of disgruntled employees, and that these statutes further required State

1  Farm to disbelieve it all or to believe it but leave Killingsworth in charge while his

2  department descended into further dysfunction and likely lawsuits for his race and gender

3  discrimination.

4  The motive of the decision maker is the issue, not the ultimate correctness of State

5  Farm's factual conclusions upon which it based its action. *Elrod v. Sears, Roebuck & Co.*,

6  939 F.2d 1466, 1470 (11th Cir. 1991) ("Much of [plaintiff's] proof at trial centered around

7  whether [plaintiff] was in fact guilty of the sexual harassment allegations leveled at him by

8  his former co-workers. . . . The inquiry . . . is limited to whether [the employer] *believed* that

9  [plaintiff] was guilty of harassment, and if so, whether this belief was the reason behind

10  [plaintiff's] discharge.").

11  The fact that State Farm denied the EEOC charges against Killingsworth brought by

12  Marian Enriquez and may have thought differently (the record does not show if it did) when

13  Eisenbraun later corroborated her accusation does not undercut State Farm's basis for

14  demotion. The conflicting accounts of the alleged "Blondie" comment could mean that State

15  Farm discounted that charge, believed it despite the conflict, or thought it unnecessary to

16  resolve. Whichever it was, no specific and substantial evidence suggests that State Farm did

17  not believe a major management disfunction was in progress. None of these disputes,

18  individually or taken together, render this general conclusion by State Farm unworthy of

19  belief. Killingsworth's focus is misplaced, and State Farm's belief in its articulated reason

20  remains unrefuted. *Cf. Pottenger v. Potlach Corp.*, 329 F.3d 740, 746 (9th Cir. 2003)

21  (holding that positive comments in the employee's performance reviews did not show

22  employer's articulated reason was unworthy of belief given that he was fired for lack of

23  confidence as opposed to poor performance).

24  Evidence of State Farm's investigatory processes likewise fails to cast doubt on State

25  Farm's articulated reason. Abnormalities in the employer's handling of a complaint against

26  its employee may be circumstantial evidence of racial discrimination. *Calmat Co. v. U.S.*

27  *Dep't of Labor*, 364 F.3d 1117, 1122-23 (9th Cir. 2004) (upholding finding of illegal

28  motivation given an usually severe reaction to a complaint by an employer, including

suspension without pay where other complaints had been treated less severely). Killingsworth fails to present any such material abnormality. He fails to present substantial and specific evidence of discriminatorily conducted investigations of comparable non-Caucasian managers. State Farm acted well within its prerogative as an employer in carrying out the investigation as it did.

The extent of an employer's investigation is a business judgment, with only a minimum requirement limiting employer freedom. *See McDonnell v. Cisneros*, 84 F.3d 256, 261 (7th Cir. 1996) (refusing to interpret the law in a way that would punish employers for undertaking serious investigations into sexual harassment claims, even when such an investigation "oversteps the proper bounds"); *Malik v. Carrier Corp.*, 202 F.3d 97, 106 (2nd Cir. 2000) (noting that the employer's duty to investigate harassment complaints is not subordinated even to the victim's desire to let the matter drop). In relying on the results of its investigation, moreover, federal law does not require the employer to make "correct" decisions. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("No matter how medieval a firm's practices, no matter how mistaken the firm's managers, the [federal discrimination statute] does not interfere.").

In this case State Farm undertook an extensive investigation of the allegations against Killingsworth. State Farm inquired of a large number of current and former subordinates of Killingsworth. The corroboration from a long list of sources, even if some of it was wrong or ill-motivated by the complainants, renders the theory of a vast conspiracy itself unworthy of belief, and State Farm was entitled to take action based on the corroboration it received rather than think it all conspiratorial. The plaintiff in a discrimination case does not produce "specific" and "substantial" circumstantial evidence of discrimination "simply by restating the prima facie case and expressing an intent to challenge the credibility of the employer's witnesses on cross-examination." *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991).

Even if Gonzales, Dannewitz, or Murphy had interviewed the witnesses Killingsworth asked them to, at best it might have shown differences of perception or opinion, which racial

and age fairness did not obligate State Farm to resolve in favor of doing nothing.  Good things said by Killingsworth's selected employees would not negate the trouble Killingsworth was having many other employees.  Even if Killingsworth's chosen employees' stories contradicted the stories of the employees who complained, State Farm would be left with the risk as to who it should believe.  That risk is financially and legally significant.  *See Malik*, 202 F.3d at 104 (noting that allegations of harassment trigger federal law and an attendant duty imposed upon employers to take reasonable steps to correct harassing behavior).

Killingsworth also has no sufficient circumstantial evidence of discriminatory processing of the charges because there is no comparable situation calling for investigation by State Farm executives.  The instances of misconduct cited in Killingsworth's briefs are not comparable.  Complaints about, or even misconduct by, lower employees create less concern for the senior executives than misconduct by supervisors.  *See, e.g.*, *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 493 (7th Cir. 1997) ("[T]he entire court agrees that an employer who is negligent in the hiring, supervision, monitoring, or retention of the plaintiff's supervisor[] is liable for the supervisor's sexual harassment . . . .").  The consequences of supervisor misconduct are far more significant and are entitled to be investigated more thoroughly and remedied with more caution for the protection of the organization.

In summary, the sheer number of complaints from diverse sources showed that even if Killingsworth was not actually at fault in all the instances, his department was in managerial crisis.  That belief is not shown to be even arguably unworthy of credence.  The further likely conclusion that Killingsworth was culpable for some, much, or most of the crisis is similarly not even arguably unworthy of belief.  Finally–and Killingsworth never addresses this–the undisputable fact of the employee revolt alone entitled State Farm to make a management change to salvage his department even if he was faultless in the revolt.

1

2

### b.   Evidence That Discrimination More Likely Motivated State Farm

3

4

5

6

7

8

As circumstantial evidence of racial discrimination Killingsworth presents only State Farm's affirmative action plan. That is not specific and substantial evidence of discrimination in this case largely for the same reasons it is not direct evidence of discrimination. Killingsworth has not challenged the validity of State Farm's affirmative action plan or submitted evidence that State Farm acted pursuant to its plan when demoting Killingsworth. Moreover, to find a valid affirmative action plan to be specific and substantial evidence of race discrimination would be inconsistent with Title VII policy.

9

10

11

12

13

14

15

16

17

18

19

To find a valid affirmative action plan to be specific and substantial circumstantial evidence of race discrimination would repeal the plaintiff's burden of showing the invalidity of an employer's affirmative action plan. *See, Johnson*, 480 U.S. at 627.  If the existence of the plan is specific and substantial circumstantial evidence of race discrimination, a plaintiff would get from it the same benefit as circumstantial evidence that he cannot get as direct evidence (*i.e.* surviving summary judgment), and without having to "shoulder the burden" of showing the plan's invalidity.  *See Bass*, 256 F.3d at 1115 (plaintiffs bear such a burden). To so find would also and illegitimately absolve the plaintiff from his duty to prove "that the employer acted pursuant to the plan in making employment decisions." *Bass*, 256 F.3d at 1110.

20

21

22

23

24

25

26

27

28

Finally, to find sufficient circumstantial evidence of race discrimination from the existence of a valid affirmative action plan would clash with Title VII doctrine.  A valid affirmative action plan would be a legitimate nondiscriminatory reason if relied upon by an employer, but evidence *against* the employer when not the basis of the employer's action. "Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision.  The existence of an affirmative action plan provides such a rationale." *Johnson,* 480 U.S. at 626.  *Accord Kamehameha Schools,* 416 F.3d at 1040.  Affirmative action plans thus normally rebut an inference of discrimination

1    and shift the burden back to the plaintiff.  Title VII was itself "intended as a spur or catalyst"

2    for the creation of such plans.  *United Steelworkers of Am., AFL-CIO-CLC V. Weber*, 443

3    U.S. 193, 204 (1979).  The evidentiary inference Killingsworth would draw is at war with

4    these principles and policies.

5        While the court is well aware of "the reluctance of this Circuit to allow summary

6    judgment where there is direct or circumstantial evidence of discriminatory intent," *Schnidrig*

7    *v. Columbia Machine, Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996), and that "courts are generally

8    reluctant to grant summary judgment in a case in which motivation and intent of a party are

9    at issue," *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983), in this case "plaintiff

10   ha[s] no indications of motive and intent, supportive of his position, to put on the scales for

11   weighing." *Id.* (internal citations omitted).  Killingsworth has not put forth "substantial" and

12   "significant" circumstantial evidence of race discrimination.  Defendants are entitled to

13   summary judgment on Count V of the Complaint.

14       **F.     The ADEA Claims**

15       The only aspect of Killingsworth's age discrimination claim that merits additional

16   discussion relates to Killingsworth's showing of pretext.  The only age-specific argument

17   made in the Response about pretext is Killingsworth's affidavit testimony that State Farm

18   insisted he "personally participate in monthly efforts to pressure older agents, all white and

19   over 50, into committing to plans for retirement."  Response at 15.

20       Although Killingsworth does cite other facts, this single argument relates the only one

21   consistent with Killingsworth's own deposition testimony.  Killingsworth's clear deposition

22   testimony was that neither Gonzales nor Dannewitz did anything in his presence that he felt

23   indicated age discrimination. PSOF Ex. 11 at 228.  Killingsworth testified, furthermore, that

24   the only statements they made that were at all "indicative of age discrimination," *id.* at 235,

25   were to direct AFEs to interview agents over 55 to see when they were going to retire.  *Id.*

26   Although  Killingsworth's  affidavit  in  spots  directly  contradicts  that  testimony,

27   Killingsworth's affidavit may not contradict his deposition testimony to create a triable issue

28   of fact. *See, e.g.*, *Orr v. Bank of America, NT & SA*, 285 F3d 764, 780 n.28 (9th Cir. 2002)

1   (finding that affidavit contradicting moving party's deposition testimony was an attempt to

2   create a triable issue, and thus rejecting the affidavit).  Accordingly, the court sustains State

3   Farm's objections to Killingsworth's Statement of Facts ¶¶ 358 and 362and other statements

4   referenced that similarly contradict the deposition, including ¶ 367.

5        As for State Farm's inquiry into their agents' retirement plans, "a company has a

6   legitimate interest in learning its employees' plans for the future, and it would be absurd to

7   deter such inquiries by treating them as evidence of unlawful conduct."  *Colosi v. Electri-*

8   *Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992); *see also Ziegler v. Beverly Enterprises-*

9   *Minnesota, Inc.*, 133 F.3d 671, 676 (8th Cir. 1998) (holding that although Ziegler had been

10  asked about retirement four times over three years and urged to retire, the evidence did not

11  create an issue of pretext for age discrimination claim).  State Farm had a legitimate interest

12  in knowing the plans of its retirement-age agents and in getting them to make such plans

13  more definite.

14       The other facts cited by Killingsworth in support of his claim of age discrimination

15  are insufficient to make a triable case of pretext for age discrimination.  That 62-year-old

16  agent Gayl Lamoureux was threatened with termination for chronic absenteeism while she

17  ran a restaurant as well as her agency, and elected retirement instead, does not show age

18  discrimination.  That various other agents retired and were replaced with younger people

19  similarly does not show that they were forced to retire because of age; almost all people who

20  retire are replaced by younger people, and there is no evidence suggesting age discrimination

21  forced these older agents out.  *See Nesbit v. PepsiCo, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993)

22  ("The subsequent hiring of younger persons to fill other openings created by attrition is

23  immaterial to [defendants'] intent with respect to [this plaintiff]").

24       **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment

25  on All Remaining Claims (doc. # 217) is granted.

26       **IT IS FURTHER ORDERED** in accordance with this order and the order entered

27  October 19, 2004 (doc. # 193) that the clerk enter judgment in favor of Defendants State

28

Farm Mutual Automobile Insurance Company and Dave Gonzales that Plaintiff John Killingsworth take nothing on his complaint, and the clerk is directed to terminate this action.

IT IS FURTHER ORDERED that Defendants' Objections to Plaintiff's Separate Statement of Material Facts ("Objections") (doc. # 270) is denied as unnecessary to the determination of Defendants' Motion for Summary Judgment on All Remaining Claims (doc. # 217), except as granted in the foregoing order.

Dated this 30th day of September 2005.

_____
Neil V. Wake
United States District Judge

1

**INDEX**

2   I.      FACTUAL SUMMARY AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . 2

3   II.     EVIDENTIARY OBJECTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4   III.    LEGAL STANDARD FOR SUMMARY JUDGMENT  . . . . . . . . . . . . . . . . . . . 4

5   IV.     CONTRACT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6           A.    The Alleged 1980 Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7           B.    The Alleged 2001 Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8           C.    Promissory Estoppel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9           D.    Good Faith and Fair Dealing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

10  V.      STATUTORY CLAIMS FOR 42 U.S.C. § 1981 RACE DISCRIMINATION AND
            ADEA AGE DISCRIMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11
            A.    Facts Specific to Killingsworth's Statutory Claims . . . . . . . . . . . . . . . . . 9
12
                  1.    State Farm's Affirmative Action Program  . . . . . . . . . . . . . . . . . . . . 9
13
                  2.    State Farm's Justification for Its Actions  . . . . . . . . . . . . . . . . . . . 10
14
                        a.    Pre-Demotion Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . 10
15
16                      **b.    Post-Demotion Complaints**  . . . . . . . . . . . . . . . . . . . . . . 13

17          B.    The Legal Standards  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18          C.    Killingsworth's Prima Facie Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19                1.    Member of Protected Class  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

20                2.    Qualified for Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

21                3.    Adverse Employment Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

22                4.    Similarly Situated Individuals  . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

23          D.    State Farm's Articulated Nondiscriminatory Reason . . . . . . . . . . . . . . . . 21

            E.    The Third Stage:  Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
24
                  1.    Direct Evidence: The Affirmative Action Plan  . . . . . . . . . . . . . . . 22
25
                  2.    Circumstantial Evidence Of Discrimination . . . . . . . . . . . . . . . . . . 24
26
                        a.    Evidence That State Farm's Explanation Is Unworthy Of Belief
27                            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28

1

            b.      Evidence That Discrimination More Likely Motivated State
                    Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2

    F.      The ADEA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28